**UNITED STATES of America, Plaintiff,**

v.

**Kerry POULACK, Defendant.**

**No. 4:99CR3020.**

United States District Court, D. Nebraska.

Aug. 20, 1999.

David R. Stickman, Federal Public Defender's Office, Omaha, NE, John C. Vanderslice, Federal Public Defender's Office, Lincoln, NE, for Kerry Poulack, defendants.

David W. Stempson, Assistant United States Attorney, Lincoln, NE, for U.S.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 37) and the objections to such Report and Recommendation (filing 39) filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the portions of the Report and Recommendation to which objection has been made. As Judge Piester has carefully and correctly found the facts and applied the law, I need only state that the Report and Recommendation should be adopted and defendant's motion to suppress must be denied.

Accordingly,

IT IS ORDERED:

1. the Magistrate Judge's Report and Recommendation (filing 37) is adopted;

2. Defendant's objection (filing 39) is overruled; and

3. Defendant's motion to suppress (filing 20), is denied.

## MEMORANDUM, ORDER AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

In an indictment filed on February 18, 1999, the defendants, Charles Guarino and Kerry Poulack, were charged with willful-

ly, knowingly and intentionally possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). (Filing 1). The defendants have filed a motion to suppress evidence obtained as a result of the alleged unlawful search of their Penske truck on February 9, 1999. (Filings 20 & 24). On June 23 and 24, 1999, a hearing was held before me on the motions. For the reasons set forth below, I conclude that Guarino's motion to suppress should be granted and Poulack's motion should be denied. I shall so recommend.

## FINDINGS OF FACT

■ Prior to addressing the facts of this case, I must note initially that this traffic stop was not videotaped. Nebraska State Trooper Russell T. Stanczyk, the trooper who initiated the stop of the defendants' vehicle, testified that although the videotape recording machine was operational, the tape was not installed in the machine properly, and as a result, there is no video record of this traffic stop. Stanczyk further testified that although he has indicator lights on his belt and in his vehicle which show whether the machine is recording properly, he never noticed that the indicator lights were not on. Nor did Stanczyk ever check the indicator lights to see if the machine was operating properly. The defendants assert that Stanczyk's asserted reason for there being no video recording of the stop is incredible, and therefore it should bear on the weight given to his credibility. The defendants essentially request that I find that Trooper Stanczyk erased or lost the original tape in an effort to "cover up" an illegal stop. I decline to make such a finding. There is no evidence that Trooper Stanczyk purposefully failed to properly install the video tape, or erased or lost the video tape of the stop. At most, the evidence establishes that Trooper Stanczyk was negligent in installing the video tape and in failing to check whether the tape was properly in-

stalled. I now turn to the stop of the defendants' vehicle.

In the early afternoon of February 9, 1999 Trooper Stanczyk was near the Greenwood, Nebraska interchange on Interstate 80 (I–80) when he observed a yellow Penske truck following too closely behind a white truck. *See* NEB. REV. STAT. ANN. § 60–6,140 (Michie 1995).[1] Trooper Stanczyk explained that he observed the Penske truck drive approximately one car length behind the white truck for approximately one-third to one-half a mile. Trooper Stanczyk further explained that NSP officers are trained to use the "two-second rule" as a guideline for following another vehicle. That is, the driver of a following vehicle should be able to count two seconds between the rear bumper of the vehicle being followed and the front bumper of his vehicle passing a stationary point. Although Trooper Stanczyk acknowledged that the "two-second rule" is not codified under Nebraska law, he testified that it is followed by the Nebraska State Patrol, and that under the circumstances, the Penske truck's following distance was "too close." As Stanczyk was observing the Penske truck, he called his dispatcher to run the truck's license plate.

Stanczyk then activated his overhead lights and stopped the Penske truck at approximately 2:47 p.m. Once the Penske truck stopped, Stanczyk exited his patrol car and motioned for the driver to accompany him to the rear of the truck. When the driver, later determined to be defendant Charles Guarino, reached the back of the truck, Trooper Stanczyk asked to see his driver's license. Guarino complied with the request. Stanczyk then told Guarino that he would be issuing him a warning ticket for following too close. Although Stanczyk testified that Guarino responded that the white truck had been driving erratically, according to Guarino, he told Stanczyk that Stanczyk had forced

---

1. Section 60–6,140 provides in relevant part: (1) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver

shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway.
NEB. REV. STAT. ANN. § 60–6,140 (Michie 1995).

the white truck to enter Guarino's lane, causing Guarino to follow the truck too closely. Thereafter, Stanczyk asked Guarino to accompany him to his patrol car, which he did. At this time Stanczyk was not aware that there was a passenger, Kerry Poulack, in the vehicle.

While completing a written warning for following too close and running a license, warrant, and criminal history check on Guarino, Stanczyk asked Guarino several questions about his trip and destination. Guarino replied that was moving back to the Boston area from Phoenix, where he had been living approximately the past six months trying to start a computer business. Guarino further stated that the truck contained approximately $20,000 worth of computer equipment and that his cousin Kerry Poulack had flown from Massachusetts to Phoenix to help him move. Stanczyk and Guarino also quickly discussed topics such as hair lines and sunglasses. According to Stanczyk, Guarino's overly friendly demeanor, and the length of time that it took Guarino to answer questions about his trip, made him nervous. He also observed that Guarino did not make eye contact and that his hands were shaking.

After Stanczyk received information from dispatch that no wants or warrants existed for Guarino and that the truck was not stolen, he asked to look at the rental agreement. When Guarino told him that it was in the cab of the truck, Stanczyk exited the vehicle, approached the passenger, Kerry Poulack, and retrieved the rental agreement. Noticing that Poulack was the person who rented the truck, Stanczyk asked for, and received, Poulack's driver's license. Stanczyk then asked Poulack questions about his trip and destination. Poulack's answers were consistent with those given by Guarino. Stanczyk then left Poulack in the truck and returned to his vehicle to run a license and warrant check on him.

Thereafter, Stanczyk received a response from the dispatcher that while Poulack did not have any wants or warrants, he did have a lengthy arrest record, including several for drugs, and was told to proceed with caution. After completing the warning ticket, Stanczyk reminded Guarino to not follow other vehicles too closely and gave Guarino his driver's license, Poulack's license and the rental agreement along with the ticket. As Guarino was attempting to exit the vehicle, Stanczyk asked Guarino if he could ask him a few questions. Although Stanczyk could not remember what Guarino's exact response was, he remembered that it was an affirmative response.[2] Stanczyk then asked Guarino several questions about the contents of the vehicle and why Poulack had rented the truck. Guarino replied that the vehicle contained computer equipment in the rear of the truck as well as two personal bags located in the cab. He also stated that he owned the computer equipment and one bag in the cab of the truck, while Poulack owned the other bag in the cab. Guarino further responded that Poulack had rented the truck because he was closer to the rental office. Finally, when asked by Stanczyk who was "in control" of the vehicle, Guarino replied that Poulack was because he had rented it. Stanczyk testified that he then told Guarino that he was going to ask Poulack for consent to search the vehicle. Stanczyk never asked Guarino for his consent.[3] As

---

**2.** Although Guarino testified that as he was exiting the patrol car, Stanczyk said, "Wait a minute, you can't leave just yet. I have one more question for you," I choose to believe Stanczyk's version.

**3.** According to Guarino, following several questions about the contents of the vehicle, Stanczyk asked him twice whether he could search the vehicle, and both times he declined. Guarino also testified that Stanczyk

never told him that he was going to ask Poulack for his consent to search the vehicle. Again, I choose to believe Trooper Stanczyk's version. Although it might have been more appropriate to ask Guarino for consent, as opposed to asking Poulack, I note that Stanczyk made a quick decision. Stanczyk apparently believed that because Poulack was "in control" of the vehicle, Poulack could consent to the search of the truck as well as its con-

he was exiting his patrol car to talk to Poulack, Stanczyk told Guarino to remain in the vehicle.[4]

About the time that Stanczyk and Guarino were discussing the contents of the vehicle, Trooper Thomas J. Meola, a dog handler for the Nebraska State Patrol, passed by them going eastbound on I–80. Stanczyk immediately radioed Meola to assist him. When Meola arrived, Stanczyk told him that he was going to ask Poulack for his consent to search the truck. He also told Meola that if Poulack did not consent, he wanted to use Meola's canine to conduct an exterior sniff of the vehicle; however, Meola did not have his dog with him that day. Stanczyk then approached Poulack, while Meola watched Guarino.

When Stanczyk approached the passenger side of the vehicle, he immediately returned Poulack's license and the rental agreement. Stanczyk testified that he then received Poulack's consent to search the vehicle. Once Poulack retrieved the keys, Poulack opened the back of the truck. After picking up one of the boxes, which according to Stanczyk felt "light," considering its size, then searching the cab area, Stanczyk returned to the back of the vehicle, opened one of the boxes and discovered marijuana. According to Stanczyk and Meola, Guarino never objected to the search of the boxes and Poulack never revoked his consent.

Contrary to Stanczyk's testimony, Poulack testified that he told Stanczyk that he would not consent to the search of the

vehicle because the property inside of it belonged to Guarino. Stanczyk then allegedly told Poulack to get the key, and he complied. Stanczyk then allegedly ordered Poulack to open the back of the truck. I am dubious of Poulack's claim, however, that Trooper Stanczyk, a thirteen-year veteran of the Nebraska State Patrol, would have ordered him to open the back of the truck without asking for his consent. Also, Poulack, a convicted felon and presently charged with possessing a substantial amount of marijuana, has everything to gain by testifying that he did not consent to the search of the truck.[5] I therefore chose to credit Trooper Stanczyk's version that he asked for, and received, Poulack's consent to search the truck.

Once Stanczyk discovered the marijuana, Guarino and Poulack were placed under arrest. According to Stanczyk, the entire stop consisted of approximately thirty-five minutes.

## DISCUSSION

### 1. Lawfulness of Traffic Stop

■ The defendants argue that the stop of their Penske truck violated the Fourth Amendment, and therefore any evidence seized as a consequence of that stop must be suppressed.[6] I disagree. The traffic stop of the defendants' truck was permissible. Following another vehicle by less than two seconds provided a basis for Trooper Stanczyk to stop the Penske truck

---

tents. Whether Stanczyk's belief is legally correct, or even reasonable, is discussed *infra;* for now, it matters only that I believe that Stanczyk did not ask Guarino for consent to search the truck prior to asking Poulack.

4. At the hearing Stanczyk testified that he did not tell Guarino to remain in the patrol car; however, Guarino's counsel impeached Stanczyk on this point. According to Stanczyk's own report, he had Guarino remain in the vehicle.

5. Poulack also argues that the fact that he invoked his *Miranda* rights after he was arrested makes it unlikely that he would have

consented to the search of his vehicle. This argument is unavailing. There could be a number of reasons why Poulack chose to consent. For instance, Poulack may have believed that once Stanczyk saw that the truck contained boxes just as they had told him, he would let them proceed to their destination. As such, I fail to discern any correlation between the fact that Poulack invoked his *Miranda* rights after he was arrested and whether he consented to the search of the truck.

6. The passenger in a vehicle may challenge the legality of a stop. *United States v. Lyton,* 161 F.3d 1168, 1170 (8th Cir.1998).

for following too close, pursuant to NEB. REV. STAT. ANN. § 60–6,140. *See* note 1, *supra.* Such a moving violation provides probable cause for a traffic stop. *See United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993) ("It is well established that a traffic violation—however minor— creates probable cause to stop the driver of a vehicle." (citations omitted)). I note that although a traffic stop may not be pretextual, "[i]f the officer is legally authorized to stop the driver, any additional 'underlying intent or motivation' does not invalidate the stop." *United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir. 1994); *see United States v. Cummins,* 920 F.2d 498, 501 (8th Cir.1990). Here, Trooper Stanczyk had a valid basis for stopping the defendants' truck; thus Stanczyk's underlying motive, if any, is irrelevant. Also, I do not find Guarino's version of the events preceding the traffic stop to be credible. Further, Guarino's theory that the trooper "ran up" on the white truck and forced it to enter Guarino's lane directly in front of him is not supported by the evidence. I therefore reject the defendants' first argument.

2. *Investigatory Detention/Consensual Encounter*

■ The defendants' next argument is that Trooper Stanczyk did not have reasonable suspicion to justify their continued detention following the conclusion of the traffic stop, and thus all evidence seized from their vehicle must be suppressed. "Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994) (citing *Barahona,* 990 F.2d at 416; *United States v. Richards,* 967 F.2d 1189, 1192–93 (8th Cir.1992)). Further inquiry, however, is limited: "An officer must have a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to the traffic violation before the officer may expand the scope of the traffic stop and continue to detain the person for additional investigation." *United States v. Carrate,* 122 F.3d 666, 668 (8th Cir.1997).

■ However, a consensual encounter does not trigger Fourth Amendment scrutiny unless the encounter loses its consensual nature. *Florida v. Bostick,* 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). "The line between a consensual encounter and a [seizure] is not a bright line but depends on the facts of the case." *United States v. McKines,* 933 F.2d 1412, 1419 (8th Cir.1991) (en banc). Circumstances indicative that an encounter has lost its consensual nature include " 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone indicative that compliance with the officer's request might be compelled.' " *United States v. Angell,* 11 F.3d 806, 809 (8th Cir.1993) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). The ultimate question is whether a reasonable person would have felt free to terminate the encounter. *See Bostick,* 501 U.S. at 434, 111 S.Ct. 2382.

■ In this case when Trooper Stanczyk issued Guarino the citation for following too close, and returned his license, Poulack's license and the rental agreement to him, although he had subjective suspicions about the defendants and their cargo, I conclude that Stanczyk did not have a reasonable, articulable suspicion that criminal activity was afoot.[7] *See Terry v. Ohio,* 392 U.S. 1, 25–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). There were no inconsistencies in Guarino's and Poulack's stories and there were no wants or warrants for Guarino or Poulack. Although Stanczyk testified that Guarino appeared ner

---

**7.** Although Stanczyk's opinion is of no legal consequence, I note that he stated at the hearing that he did not believe that he had

probable cause or reasonable suspicion to detain Guarino and Poulack further.

vous, "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." *United States v. Beck,* 140 F.3d 1129, 1139 (8th Cir.1998) (citation omitted). As such, I give little weight to this observation. Likewise, I give little weight to Stanczyk's assessment that Guarino was "overly friendly." Thus, the issue is whether this was a consensual encounter between Guarino and Stanczyk. I conclude, on these facts, that it was.

■ In this situation, once Stanczyk gave Guarino his documents, he had everything he needed to lawfully proceed on his journey to Massachusetts, so that a reasonable person would feel free to leave. Stanczyk then asked whether he could ask Guarino a few questions; Guarino acquiesced. Although the encounter took place in Stanczyk's patrol car and Stanczyk did not advise Guarino that he was free to leave, these facts do not elevate this encounter into a seizure, absent other evidence of coercion. In this case, there was no evidence of coercion or threats, and the tone of the conversation did not indicate that Guarino was required to answer Stanczyk's questions. Considering the totality of the circumstances, I conclude that this was a consensual encounter, not a seizure requiring reasonable suspicion. *See United States v. White,* 81 F.3d 775, 779 (8th Cir.1996) ("A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area—even if the officer has no reason to suspect the individual is involved in criminal activity—provided the officer does not indicate that compliance with his request is required." (citation omitted)).

The defendants next argue that even if Stanczyk's continued detention and questioning of Guarino began as a consensual encounter, it became an investigatory detention when Stanczyk continued the encounter after Guarino allegedly refused to consent to the search of the truck, Stanczyk ordered Guarino to remain in the patrol car, and Stanczyk approached Poulack

in an effort to obtain his consent to search the vehicle. *See Beck,* 140 F.3d at 1135 (stating that "a consensual encounter may become an investigatory detention as a result of police conduct"). I have already concluded that Stanczyk did not ask for Guarino's consent, and thus Guarino could not have denied consent. The defendants' argument, as a result, boils down to whether the consensual encounter between Stanczyk and Guarino ceased when Stanczyk told Guarino to remain in the patrol car while he approached Poulack to ask for his consent to search the truck. I need not resolve this issue, because even assuming that Poulack and Guarino were then illegally detained, *cf. United States v. Ramos,* 42 F.3d 1160 (8th Cir.1994), I conclude, for the reasons discussed more fully below, that Poulack's consent to the search of the truck was not a product of his illegal detention.

### 3. *Poulack's Consent to the Search of the Truck was an Act of Free Will*

■ The question is whether Poulack's consent to the search of the truck was "'sufficiently an act of free will to purge the primary taint.'" *Id.* at 1164 (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963)). In making such a determination, the court must consider the following factors:

> [W]hether [the defendant] understood his right to withhold consent, the temporal proximity of his consent and the prior Fourth Amendment violation, the presence of intervening circumstances, "and, particularly, the purpose and flagrancy of the official misconduct."

*United States v. McGill,* 125 F.3d 642, 644 (8th Cir.1997) (quoting *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)), *cert. denied,* 522 U.S. 1141, 118 S.Ct. 1108, 140 L.Ed.2d 161 (1998).

■ Turning to the factors to be considered in accordance with *McGill* and *Brown, supra,* I look first to whether Pou-

lack "understood his right to withhold consent." Here, Trooper Stanczyk did not explain to Poulack that he could withhold his consent to search the truck. While this factor is not controlling, because police officers are not required to inform a person that he does not have to consent, *see United States v. Palacios–Suarez*, 149 F.3d 770, 773 (8th Cir.1998) (concluding that the defendant's consent was an act of free will, even though the police officer did not explain to the defendant that he could withhold consent), it is still a circumstance that must be considered.

Turning to the temporal proximity factor and the presence of intervening circumstances, it is clear from the testimony adduced at the hearing that Trooper Stanczyk requested Poulack's consent to search the vehicle immediately following the unlawful detention of Poulack and Guarino. In addition, there were no relevant intervening circumstances between the unlawful detention and Poulack's consent to search the vehicle. These factors, therefore, weigh heavily in support of a finding that Poulack's consent was the product of the unlawful seizure. *See Dunaway v. New York*, 442 U.S. 200, 218, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) ("When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts.").

Finally, "[t]urning to the most critical factor[,]" the purpose and flagrancy of the official misconduct, *see McGill*, 125 F.3d at 644, it does not appear that Trooper Stanczyk was "attempting to exploit an illegal situation," *Ramos*, 42 F.3d at 1164. Even if Trooper Stanczyk's conduct was technically illegal, his conduct was in good faith, and the constitutional violation was not flagrant.

Considering all the factors discussed in *McGill* and *Brown, supra*, I conclude that

Poulack's consent was " 'sufficiently an act of free will to purge the primary taint.' " *Ramos*, 42 F.3d at 1164 (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–417). I further reject the defendants' contention that Poulack was under "oppressive circumstances" when he consented. The stop took place on the side of an Interstate highway, not in some secluded place. It was daytime. Poulack is an adult. He was not under the influence of any substances. Simply put, Poulack's consent was voluntary and it was not the product of an illegal detention. *See Ramos*, 42 F.3d at 1164.

### 4. *Search of the Boxes*

■ Despite my finding that Poulack's consent was an act of free will, the question still remains whether Poulack possessed the requisite authority to consent to the search of Guarino's boxes. However, prior to a discussion of whether the search of the boxes violated the defendants' Fourth Amendment rights, I must first address whether Poulack can even challenge the search of the boxes.[8] The United States Supreme Court has explained that " 'Fourth Amendment rights are personal [and] may not be vicariously asserted.' " *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *see United States v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (stating that defendants may claim the benefits of the exclusionary rule only if their own Fourth Amendment rights have been violated). In *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the Supreme Court stated that "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one which has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understand-

---

**8.** Clearly, Guarino, as the owner of the boxes, has a legitimate expectation of privacy in them. Therefore, he may assert a violation of his Fourth Amendment rights.

ings that are recognized and permitted by society.'" *Id.* at 472 (quoting *Rakas,* 439 U.S. at 143–44 & n. 12, 99 S.Ct. 421); *see United States v. Muhammad,* 58 F.3d 353, 355 (8th Cir.1995) ("The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search.").

■ Here, it is clear from Poulack's own testimony that he did not own the boxes and he did not have a possessory interest in the contents of the boxes. Poulack's sole interest appears to be that Guarino's boxes were in an area where Poulack had a legitimate expectation of privacy, that is, they were contained within his rental truck. I conclude that such an interest is insufficient to permit Poulack to challenge the search of the boxes.[9] *See United States v. McGrath,* 613 F.2d 361, 365–66 (2nd Cir.1979) (concluding that the absent owner and the driver of the vehicle did not have a legitimate expectation of privacy in the search of the passenger's briefcase).

I now turn to Guarino's contention that the search of his boxes violated his Fourth Amendment rights because Poulack lacked the requisite authority to consent to the search of them. The government responds that the search was proper under the actual and apparent authority doctrines, and alternatively that Guarino impliedly consented to the search.

### A. *Whether Poulack Possessed Actual Authority to Consent to the Search of the Boxes*

The government asserts first that because Poulack rented the truck, he possessed the requisite authority to consent to the search of the vehicle and the boxes, regardless of the fact that Guarino owned the boxes. In support of its argument, the government cites *United States v. Buckles,* 495 F.2d 1377 (8th Cir.1974). Guarino re-

sponds that because the boxes in the back of the truck belonged to him, Poulack lacked the requisite authority to consent to the search of the them, even though Poulack rented the truck. In support of his argument, Guarino urges this court to adopt the reasoning employed in *United States v. Welch,* 4 F.3d 761 (9th Cir.1993).

In *Buckles,* the Eighth Circuit concluded that the owner of a home could consent to the search of the defendant's jacket, even though the owner had told police that the jacket was not hers. In rendering its decision the court relied on its decision in *Maxwell v. Stephens,* 348 F.2d 325 (8th Cir.1965), in which it said:

[Defendant's argument that his coat cannot be seized without his consent] overlooks the consent to the officers' acquisition of the coat by a person having the proprietary interest of the premises where it was. * * * It was an item which freely came into the hands of the authorities by one who had the right to make it available to them. * * *

The situation therefore appears to us to be one not involving any unreasonable search or seizure within the prohibition of the Fourth, Fifth and Fourteenth Amendments. Reasonableness, after all, is the applicable standard.

*Buckles,* 495 F.2d at 1382 (quoting *Maxwell,* 348 F.2d at 337, 338).

The *Buckles* decision is distinguishable from the facts of this case. In *Buckles* the defendant was not present when the officers took the jacket. Nor does it appear from the facts set forth in the *Buckles* opinion that the officers knew that the jacket belonged to the defendant. Also, defendant's jacket was unsecured and in a common area, and thus accessible to every person entering the home. Under those circumstances, the defendant in *Buckles* assumed the risk that the owner of the home would let someone look inside his

---

**9.** Although Poulack claims that the government has waived its objection to whether he has a legitimate expectation of privacy in Guarino's boxes, the Eighth Circuit has stated that the burden of proving a Fourth Amendment violation is on the defendant. *Muhammad,* 58 F.3d at 355. Here, Poulack failed to meet his burden.

jacket. *Cf. Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (stating that the defendant, in leaving a duffel bag at his cousin's house and allowing his cousin to use the bag, "must be taken to have assumed the risk that [the defendant's cousin] would allow someone else to look inside").

In this case, however, Guarino was present at the time of the search of the boxes [10] and Stanczyk knew that the boxes belonged exclusively to Guarino. Instead of asking Guarino for consent to search *his* boxes, however, Stanczyk skirted Guarino by seeking Poulack's consent. Finally, Guarino's boxes were wrapped and sealed, thus evidencing a greater subjective expectation of privacy in his sealed boxes than the defendant in *Buckles* had in his jacket, which was left in the open for anyone to search through. *See United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir.1998) (concluding that cardboard boxes containing personal belongings were entitled to an expectation of privacy); *United States v. Block*, 590 F.2d 535, 541 n. 8 (4th Cir.1978) ("Obviously not every 'enclosed space' within a room or other area, *e.g.*, pockets in clothes, unsecured shoe boxes, and the like can claim independent status as objects capable of search not within the reach of the authorized area search. The rule has to be one of reason that assesses the critical circumstances indicating the presence or absence

of a discrete expectation of privacy with respect to the particular object: whether it was secured, whether it is commonly used for securing privacy, etc."). In light of the distinctions between the facts of this case and the facts in *Buckles*, I conclude that the *Buckles* decision is not controlling.

Because my research has failed to uncover an Eighth Circuit decision which controls this case,[11] I shall consider Guarino's invitation to adopt the reasoning employed by the Ninth Circuit in *Welch*, a case strikingly similar to this case. Furthermore, although not cited by the parties, I shall consider the Fifth Circuit's decision in *United States v. Jaras*, 86 F.3d 383 (5th Cir.1996). Because the facts and issues in *Welch* and *Jaras* are comparable to the facts and issues of this case, a discussion of the two cases is helpful.

In *Welch*, Sharon Welch and her co-defendant David Anthony McGee were gambling in a casino in Las Vegas, Nevada, when casino employees became suspicious that the two were passing counterfeit bills. Security personnel escorted McGee and Welch to the security office where they were interviewed. At some point, McGee was taken into a separate interview room where he gave written consent to the search of the car rented by himself and Welch. Inside the car security personnel found several suitcases as well as a woman's purse in the trunk. Security person-

**10.** Because Guarino was present and in control of his boxes, no argument can be made that he abandoned them. Furthermore, Guarino's presence and his assertion of ownership make it less likely that he assumed the risk that Poulack would consent to the search of his boxes.

**11.** The Eighth Circuit has decided several third-party-consent cases; however, in those cases, the court did not discuss the actual authority issue, and instead decided the case on other grounds. *See, e.g., United States v. Hammons*, 152 F.3d 1025, 1027–28 (8th Cir. 1998) (concluding that the consenting third party had apparent authority), *cert. denied*, 525 U.S. 1092, 119 S.Ct. 849, 142 L.Ed.2d 703 (1999); *United States v. Czeck*, 105 F.3d 1235, 1239–40 (8th Cir.1997) (concluding that

the consenting third party had apparent authority); *United States v. Brokaw*, 985 F.2d 951, 953–54 (8th Cir.1993) (relying on the apparent authority doctrine, the court concluded that third party could consent to search of trailer occupied by the defendant but located on the third party's property and owned by the third party); *United States v. Wright*, 971 F.2d 176, 180 (8th Cir.1992) (noting that it did not have to determine whether the homeowner could consent to the search of the guest's bag because the incriminating evidence inside of the bag was in plain view); *United States v. Ruiz*, 935 F.2d 982, 984–85 (8th Cir.1991) (concluding that the defendant had abandoned his interest in the bag, thus obviating the need to discuss third party consent issue).

nel opened the purse and found Welch's driver's license and several counterfeit twenty-dollar bills. Thereafter, Welch and McGee were placed under arrest.[12]

The United States Court of Appeals for the Ninth Circuit initially concluded that while McGee did have the authority to consent to the search of the rental car because he had jointly rented it with Welch, he did not possess the actual authority to consent to the search of Welch's purse. The Court stated: "The shared control of 'host' property does not serve to forfeit the expectation of privacy in containers within that property." *Welch*, 4 F.3d at 764 (citing *United States v. Karo*, 468 U.S. 705, 725–27, 104 S.Ct. 3296, 3308–10, 82 L.Ed.2d 530 (1984) (O'Connor, J., concurring)). Because the government produced no evidence demonstrating that McGee "had use of, let alone joint access to or shared control over, Welch's purse," the court concluded that McGee could not consent to the search of the purse. *Id.*

The Ninth Circuit further rejected the government's argument that the apparent authority doctrine validated the search of Welch's purse. The Ninth Circuit concluded that because there were no facts that would lead a reasonable officer to believe that McGee had shared use and joint control over or access to Welch's purse, the apparent authority doctrine did not apply. *Id.* at 765. The court also stated that even if the security officers reasonably believed that McGee had the authority to consent to the search of Welch's purse because she left it in the rental car, the apparent authority doctrine would not apply because " '[r]easonable belief' cannot save the search because the officers' errors were errors of law and not fact." *Id.* (citations omitted).

In *Jaras*, Roman Salazar was driving his car when a police officer stopped him for driving erratically and to determine whether he was intoxicated. The defen-

dant, Jose Jaras, was a passenger in Salazar's car. Following a discussion by the officer with Jaras and Salazar in which they gave conflicting stories, the officer asked Salazar for his permission to search the car, and Salazar acquiesced. When the officer opened the trunk, Salazar asserted ownership of the garment bag; he told the officer, however, that the suitcases belonged to Jaras. Jaras, who was standing near the trunk, did not respond. The officer subsequently picked up the suitcases, noted that they were rather heavy, and asked Jaras what was inside of them. He replied that he did not know. The officer then opened the suitcases and discovered marijuana. Jaras and Salazar were arrested.

The United States Court of Appeals for the Fifth Circuit determined that Salazar lacked the actual authority to consent to the search of Jaras's suitcases. The court found that "[t]he fact that Jaras's suitcases were contained in the trunk of a car in which he was a passenger is insufficient to show that Salazar mutually used and had joint control over the suitcases." *Jaras*, 86 F.3d at 389 (citations omitted); *cf. United States v. Crain*, 33 F.3d 480, 484 (5th Cir.1994) (concluding that the driver's consent to the search of the vehicle extended to paper bag under the seat). The court further concluded that Salazar did not have the apparent authority to consent to the search of Jaras's suitcases. Specifically, the court found that because the officer knew that the suitcases belonged to Jaras, not Salazar, it was not objectively reasonable for the officer to rely on Salazar's consent to search Jaras's suitcases. *Id.* (citing *United States v. Infante–Ruiz*, 13 F.3d 498, 505 (1st Cir.1994)). Finally, the court concluded that Jaras did not impliedly consent to the search of his suitcases. *Id.* at 390.

---

12. In *Welch*, the magistrate judge found that the "security officers were acting at the direction of state law enforcement authorities and, therefore, that their actions were subject to the Fourth Amendment." *Welch*, 4 F.3d at 763 n. 3. The government did not challenge this finding on appeal. *Id.*

 As in *Jaras* and *Welch,* one of the issues in this case is whether Poulack had the actual authority to consent to the search of Guarino's boxes by virtue of the fact that he rented the truck and thus had the authority to consent to the search of the truck. A finding of actual authority depends on whether there is "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The uncontroverted evidence presented at the suppression hearing establishes that Guarino was the owner of the boxes, that Poulack did not have use of, let alone joint control over or access to, those boxes, and that Guarino never provided Poulack with the authority to consent to the search of his boxes. There was simply no ambiguity about who owned the boxes. Accordingly, as the Fifth Circuit found in *Jaras, supra,* and the Ninth Circuit found in *Welch, supra,* on similar facts, I conclude that while Guarino's boxes were contained within an area that Poulack had joint access to or control over, Poulack did not possess the actual authority to consent to the search of Guarino's boxes.[13] *See United States v. Heisman,* 503 F.2d 1284, 1288 (8th Cir. 1974) (concluding that while co-lessee could consent to the search of the common areas of the office, he could not consent to the other co-lessee's office because he did not have access or control of that office); *Block,* 590 F.2d at 541 (concluding that

mother could consent to the search of her son's room, but not to the search of her son's trunk in his room); *but see United States v. Perez,* 948 F.Supp. 1191, 1200–01 (S.D.N.Y.1996) (concluding that a father had authority to consent to a search of his son's bedroom and the closed containers therein, even though the son had been the sole occupant and user of the bedroom for four years, the father did not use the bedroom for any purpose, and he had never accessed the personal effects in his son's closet); *cf. United States v. Martinez,* 450 F.2d 864, 865–66 (8th Cir.1971) (owner who had combination to padlock on garage where stolen property was stored in boxes and who used it to park car could consent to search).[14]

B. *Whether Poulack Possessed the Apparent Authority to Consent to the Search of the Boxes*

 The government next argues that Poulack possessed the apparent authority to consent to the search of the boxes. Under the apparent authority doctrine, a search will be valid if the facts available to the police officer at the time of the search would warrant a reasonable person in the belief that someone with authority over the items or containers to be searched consented to the search. *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Importantly, however, this doctrine is limited to mistakes of fact, not law. 3 WAYNE R. LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 8.3(g), at 746 & n. 119 (3d ed.1996). Thus, for example, this doctrine would not validate an officer's erroneous belief that a landlord is legally

---

**13.** In *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991),the Supreme Court concluded that it was objectively reasonable for the officer to believe that the owner's consent to the search of the vehicle extended to a paper bag within the vehicle. However, the *Jimeno* case dealt with the scope of the consent, whereas the issue in this case is whether Poulack possessed the authority, either actual or apparent, to effectively consent to the search of Guarino's boxes. *See*

*Welch,* 4 F.3d at 764. The *Jimeno* case is, therefore, not dispositive.

**14.** The *Martinez* case is distinguishable from this case because in *Martinez* the officers did not open the defendant's boxes. Instead, the officers in *Martinez* merely entered the area were the boxes were stored, pursuant to the owner's lawful consent, and copied the identification numbers from the boxes.

authorized to consent to the search of a tenant's apartment. *United States v. Brown,* 961 F.2d 1039, 1041 (2nd Cir.1992); *see also Welch,* 4 F.3d at 764–65 (recognizing mistake of fact-law distinction); *United States v. Salinas–Cano,* 959 F.2d 861, 865–66 (10th Cir.1992) (same); *United States v. Whitfield,* 939 F.2d 1071, 1073–74 (D.C.Cir.1991) (same).

▆ In this case Stanczyk apparently believed that because the boxes were inside of Poulack's rental truck, Poulack's consent to the search of that truck extended to the search of the boxes.[15] The apparent authority doctrine, however, has no application in this case, because Stanczyk was not arguably mistaken as to any essential facts, i.e., there was no question that Poulack rented the vehicle and that the sealed boxes in the back of the truck belonged exclusively to Guarino. Rather, Stanczyk was mistaken as to the law, i.e., he believed that the renter of a vehicle could consent to the all items in the truck, regardless of ownership. *See Salinas–Cano,* 959 F.2d at 866 (holding that the police could not infer that the homeowner had the authority to consent to the search of the defendant's bag " 'merely from [the consenter's] ownership of the house' " (citation omitted)). Accordingly, I reject the government's argument.[16]

### C. Whether Guarino Impliedly Consented to the Search of His Boxes

▆ The government's final argument is that Guarino impliedly consented to the search of his boxes by not objecting when Stanczyk opened the back of the truck and looked inside the boxes. In support of its argument the government relies on *United States v. Eldridge,* 984 F.2d 943 (8th Cir. 1993) and *United States v. Stapleton,* 10 F.3d 582 (8th Cir.1993). In both cases the Eighth Circuit concluded that the defendant had impliedly consented to the search.

I find both *Stapleton* and *Eldridge* to be distinguishable from this case. In both *Stapleton* and *Eldridge,* the defendant was either present when the driver consented to the search of the vehicle or was at least informed prior to the search, that the driver had consented to the search. *Stapleton,* 10 F.3d at 584; *Eldridge,* 984 F.2d at 948. Also, in both cases, the defendant did not object to the search; instead, he remained silent during the search. *Stapleton,* 10 F.3d at 584; *Eldridge,* 984 F.2d at 948. In this case, although Guarino also remained silent throughout the search of his boxes, he was not present when Poulack consented to the search the truck. Nor was he informed prior to Stanczyk conducting the search that Poulack had consented to the search. Guarino did know that Stanczyk was going to ask Poulack for consent to search the truck; however, for all he knew, Poulack denied consent and Stanczyk ordered Poulack to open the back of the truck. Under these circumstances, I conclude that Guarino did not impliedly consent to the search of his boxes by failing to object during the search of his boxes. *See Jaras,* 86 F.3d at 390 (concluding that the defendant's consent cannot be inferred where the defendant was never asked for consent to search, was not pres-

---

15. This is evidenced by Stanczyk's question to Guarino about who was "in control" of the truck. After Guarino said that Poulack was in control of the truck, Stanczyk immediately proceeded to approach Poulack and ask for his consent to search the truck.

16. Even if the apparent authority doctrine were applicable, however, it would not serve the government's position. The test is whether in light of all the facts and circumstances, it was objectively reasonable for Stanczyk to believe that Poulack had authority to consent to the search of the boxes. *See Hammons,*

152 F.3d at 1027 (citation omitted). In light of the fact that he had been told explicitly that they were Guarino's boxes alone, and that Poulack was merely helping out Guarino in the move, that is, they were not on a "joint" mission, I do not believe Stanczyk's belief was objectively reasonable. He had been told that the whole purpose of the trip was to move Guarino, and Poulack's having rented the truck was only because of a fortuitous happenstance of the location of the rental office. With Guarino present and available, it was not objectively reasonable to fail to seek his consent instead of Poulack's.

ent when the driver consented and never heard the officer ask the driver for consent to search).[17]

██ I find further support for my decision in a case recently decided by the Eighth Circuit. In *United States v. $404,-905.00 in U.S. Currency*, 182 F.3d 643, 649 n. 3 (8th Cir.1999), the Eighth Circuit concluded that a suspect did not impliedly consent to the search by not objecting when the officer told him that the canine would sniff the vehicle's exterior, or when the officer told him that he would search the trailer after the canine alerted. The Eighth Circuit reiterated that " '[t]he government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.' "[18] *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Similarly in this case, as the foregoing discussion makes clear, the government has failed to show that Guarino did more than merely submit

to a claim of lawful authority. Accordingly, I reject the government's argument.[19]

## CONCLUSION

After careful consideration of the matters before me, I conclude that the initial stop of the defendants was lawful. I also conclude that even assuming the defendants were unlawfully detained, Poulack's consent to the search of the truck was a product of free will. I further conclude that Poulack did not have a legitimate expectation of privacy in the search of Guarino's boxes, and therefore his motion to suppress must be denied in its entirety. Finally, with respect to Guarino, I conclude that the search of his boxes violated the Fourth Amendment, and therefore his motion to suppress the evidence seized from his boxes must be granted. For these reasons,

**IT HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that defendant Guarino's motion to suppress, (filing 24),

---

**17.** Although the defendant in *Jaras* was informed prior to the search of his suitcase that the driver had consented to the search of the car, the Fifth Circuit still found that the defendant had not impliedly consented to the search. *Jaras*, 86 F.3d at 386, 390. While such conduct might support a finding of implied consent, *see Stapleton*, 10 F.3d at 584, the fact that there is no evidence that Guarino was ever informed that Poulack had consented to the search sets this case apart.

**18.** The court concluded that the search of the truck was valid on other grounds. Specifically, the court concluded that "when a police officer makes a traffic stop and has at his immediate disposal the canine resources to employ this uniquely limited investigative procedure, it does not violate the Fourth Amendment to require that the offending motorist's detention be momentarily extended for a canine sniff of the vehicle's exterior." *$404,-905.00 in U.S. Currency*, 182 F.3d at 649.

**19.** The government also argues in its supplemental brief that once the consensual search produced a reasonable articulable suspicion that the car contained contraband (in this case, the government asserts the irregularity was that Stanczyk believed that the box he lifted up was "light," considering its size),

Stanczyk had probable cause to search the boxes. *See United States v. Casares–Cardenas*, 14 F.3d 1283, 1286 (8th Cir.1994) (stating that "a warrantless search of an automobile, predicated on consent, may be expanded beyond the scope of consent when it yields a basis for a reasonable articulable suspicion that additional contraband may be found in parts of the car not included in the consent" (citation omitted)). I find nothing irregular about the box being light, considering its size. I note that Stanczyk never inquired what type of computer equipment that Guarino was transporting and that he lifted only one box prior to conducting a search of the boxes. For all Stanczyk knew, the box that he picked up contained only keyboards, mouses, cords and/or motherboards. Certainly, a box containing these items would be "light." Because Stanczyk did not know the type of computer equipment that Guarino was allegedly transporting, I conclude that his discovery of a "light" box did not give rise to probable cause for him to search the boxes. If Guarino had told Stanczyk that the boxes contained computer monitors, maybe I would reach a different result; however, that case is not before me.

be granted and that defendant's Poulack's motion to suppress, (filing 20), be denied in its entirety.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.