753 A.2d 1179 (2000)
332 N.J. Super. 452
STATE of New Jersey, Plaintiff-Respondent,
v.
Alexander CHAPMAN, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Ruben Velez, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued June 1, 2000.
Decided June 30, 2000.
*1181 Carl H. Hadigian, Designated Counsel, for defendant-appellant Alexander Chapman; Susan Brody, Assistant Deputy Public Defender, for defendants-appellants (Ivelisse Torres, Public Defender, attorney; Ms. Brody, of counsel and on the brief).
Daniel I. Bornstein, Deputy Attorney General, for plaintiff-respondent (John J. Farmer, Jr., Attorney General, attorney; Mr. Bornstein, of counsel and on the brief).
Before Judges BAIME, BROCHIN and WECKER.
*1180 The opinion of the court was delivered by BAIME, P.J.A.D.
Following the denial of their motions to suppress evidence, defendants Alexander Chapman and Ruben Velez pled guilty to second degree possession of at least five pounds of marijuana with intent to distribute (N.J.S.A. 2C:35-5a(1) and N.J.S.A. 2C:35-5b(10)). Finding that the mitigating circumstances substantially outweighed the aggravating factors, the trial court sentenced each defendant to three years imprisonment pursuant to N.J.S.A. 2C:44-1f(2). Defendants filed separate appeals contending that the police engaged in an unlawful search and seizure. We now consolidate these appeals and affirm the defendants' convictions.

I.
At 2:13 p.m. on January 28, 1992, State Trooper Ricardo Ocetnik was patrolling Route 80 when he observed a Ford pickup truck bearing California license plates weaving between lanes along a one and one-half mile stretch. The truck was also fluctuating in speeds. Believing that the driver was either intoxicated or fatigued, the officer activated the overhead lights to his patrol car.
The pickup truck promptly stopped along the shoulder of the highway. Trooper John L. Kratzer and William Hanley arrived at the scene shortly thereafter. We digress to note that much of the police investigation that ensued was recorded by a "Video Incident Capture System" mounted on the hood of Trooper Ocetnik's patrol car. Moreover, Trooper Ocetnik wore a microphone and some, but not all, of the officer's conversations with the occupants of the pickup was sound recorded.
Chapman was sitting in the driver's seat. Scott Curran was sitting in the front passenger seat. Ruben and Roberto Velez[1] were sitting in the rear seat. Trooper Ocetnik asked Chapman for his license and registration. Chapman produced a registration identifying him as the owner of the pickup truck, but told Ocetnik that he had "lost" his driver's license. At this point, Ocetnik was no longer concerned that defendant was intoxicated. He nevertheless asked all the passengers to produce identification, preferably their drivers' licenses, because Chapman could not legally operate the vehicle. Each produced a California driver's license.
Upon request, Chapman exited the pickup truck. Ocetnik explained his reason for stopping him, noting that he suspected there was a problem with intoxication or fatigue. The police videotape reveals Chapman's acknowledgment that he was fatigued. Upon questioning, defendant mentioned that he was a stuntman and had decided to take a trip before his next film, noting "we went to [Las] Vegas" and "won some money." Chapman indicated that the four men had left California together. Chapman told Ocetnik that he, Curran, and the Velezes were friends and that the Velez brothers were in the record business and he was attempting to find work for Curran as a stuntman. Chapman admitted *1182 that his driver's license had been suspended. Ocetnik told him that he intended to issue a summons for that offense, and that one of the passengers might be required to take over as driver. Chapman noted that he and his friends were "en route" to New York City.
While Chapman was being questioned, Trooper Kratzer engaged the passengers in conversation. Curran mentioned that he had won $4,000 in Las Vegas and that the Velez brothers had "broken even." Upon returning to the pickup truck, Chapman contradicted Curran's account and his own earlier statement by indicating to Kratzer that he alone had been in Las Vegas. Curran later insisted that he had been in Las Vegas with Chapman and the Velez brothers.
The subject was further pursued by Ocetnik when he questioned Roberto Velez out of the presence of the other individuals. Roberto unequivocally denied that he had been to Las Vegas. After speaking with Roberto, Ocetnik directed him to sit in the driver's seat in order to be the designated driver. Ocetnik also questioned Ruben Velez. Although Ruben was apparently not asked whether he had accompanied Chapman to Las Vegas, Ocetnik noticed that he was "dripping" with perspiration despite the frigid January weather. Ruben noted that he and his brother were originally from Colombia. Although Ocetnik had read books and articles about Columbian drug cartels, he testified that this fact did not "alone" heighten his suspicion.[2]
The subject of who had gone to Las Vegas and when continued to plague the officers. Ocetnik asked Chapman if he went to Las Vegas alone or with the other passengers. In response, Chapman said he went by himself "to pick up Shaggy," referring to Curran. Curran indicated that he had driven with Chapman to Las Vegas. The two then returned to California where they picked up the Velez brothers. Curran said that all four men drove to Illinois where they watched the Super Bowl.
The troopers returned to Ocetnik's patrol car and discussed the inconsistencies in the statements of Chapman, Curran and the Velez brothers. Ocetnik "ran a check" on the four men's drivers licenses, and prepared a summons for driving with a revoked license and a warning for careless driving. Ocetnik also prepared a consent to search form, anticipating that he would ask Chapman's permission to examine the pickup truck and its contents. Kratzer returned to the truck and explained that he and the other officers were "computer checking" the four men's drivers' licenses.
Chapman was asked to exit the vehicle. After repeating Kratzer's explanation for the reason for the delay, Ocetnik told Chapman that he had issued a summons for driving with a revoked license and a warning for careless driving. Ocetnik then read aloud to Chapman the consent to search form, including the portion detailing the right to refuse. Specifically, the form stated:
I, Alex Chapman ... hereby authorize Trooper I R. Ocetnik 3131, a member of the New Jersey State Police and any other officer designated to assist, to conduct a complete search of 1984 Ford P/U....
I further authorize the above member of the New Jersey State Police to remove and search any letters, documents, papers, materials, or other property which is considered pertinent to the investigation, provided that I am subsequently given a receipt for anything which is removed.

*1183 I have knowingly and voluntarily given my consent to the search described above.
I have been advised by Trooper I R. Ocetnik 3131 and fully understand that I have the right to refuse giving my consent to search.
I have been further advised that I may withdraw my consent at any time during the search.
At one point, Chapman asked, "I'm not signing ... myself away when I sign this thing?" Ocetnik responded that the request to search form was not an admission of guilt, but rather a consent to examine the pickup truck.
After Chapman signed and dated the form, Trooper Ocetnik began to search the truck. Ocetnik found two large suitcases in the cargo area. When Ocetnik slid one of the suitcases out, Kratzer immediately detected a strong odor of raw marijuana. Ocetnik noticed the same smell. Each individual was asked whether he owned the suitcase. They all disclaimed ownership. Ocetnik then opened the suitcases. In one, the officers found twenty-eight packages of suspected marijuana and an open box of baking soda.
Chapman testified at the motion hearing. According to his testimony, Kratzer told him that Ocetnik "would probably want to search" the truck. If he consented, the troopers would immediately search the vehicle and then allow the four men to leave. Chapman testified that he was told that if he refused consent, he would be arrested and jailed and the truck would either be impounded or searched pursuant to a warrant the trooper would obtain from a judge. Chapman acknowledged signing the consent to search form after Ocetnik read it aloud, but testified that he did not understand that he had the right to refuse.
After reviewing the videotape, the judge denied defendants' motions. The judge emphasized that the detention of the vehicle and its occupants was reasonable in light of Chapman's admission that his license had been suspended and the conflicting statements given by the four men. The judge further noted that the videotape did not indicate that either Chapman or Velez appeared intimidated or that the trooper acted in a threatening or coercive manner. The judge found that Chapman's consent was voluntarily given. The judge noted that Chapman's eyes were focused on the consent form as it was read to him. In the course of his oral opinion, the judge added that he found most of Chapman's testimony credible. However, the judge stressed that he did not believe Chapman's claim he did not understand the rights recited in the consent to search form.
The judge did not make a specific finding with respect to the credibility of Chapman's testimony that he was told he would be arrested and the truck impounded and searched if he refused to consent to a search of the vehicle. We were concerned with the possibility that Chapman's consent might have been "`no more than acquiescence to a claim of lawful authority'" and thus involuntary. State v. Dolly, 255 N.J.Super. 278, 285, 605 A.2d 238 (App.Div.1991) (quoting Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968)); see also State v. LaDuca, 89 N.J.Super. 159, 166, 214 A.2d 423 (App.Div.1965). We thus remanded the matter to the Law Division for further development of the record and specific findings. Pursuant to our remand order, the parties were permitted to argue the point. The judge issued a written opinion in which he found Chapman's testimony on this subject untrue and incredible. The judge observed that he would have suppressed the evidence had he believed this portion of Chapman's testimony.
The parties were afforded the opportunity to file supplemental briefs. The matter was then reargued. We now sustain the search and affirm defendants' convictions.

II.
Defendants concede that the initial stop of Chapman's pickup truck was lawful.
*1184 They nevertheless argue that the detention that followed the stop was not based upon an articulable suspicion of criminal activity or other justification and that the consent to search was involuntary. We disagree.
We begin with the question whether the approximately forty-five minute detention that followed the traffic stop was sufficiently limited in scope to remain within the bounds authorized by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). While we do not endorse all of the questions propounded by the troopers to the occupants of the vehicle, we hold that the duration of the detention and the degree of intrusion into constitutionally protected privacy interests did not exceed permitted bounds.
The Fourth Amendment guarantees "`[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" State v. Dickey, 152 N.J. 468, 475, 706 A.2d 180 (1998) (quoting U.S. Const. amend. IV). A stop of an automobile for a traffic violation, even if only for a limited purpose, "constitutes a `seizure' of `persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996) (quoting Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660, 667 (1979)); see also United States v. Martinez-Fuerte, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116, 1127 (1976); United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607, 614 (1975). Although the public "is accorded less privacy in automobiles because of th[e] compelling governmental need for regulation" and their mobility, California v. Carney, 471 U.S. 386, 392, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406, 414 (1985); see also Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 2487, 135 L.Ed.2d 1031, 1036 (1996); Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 714-15 (1973); Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 429 (1970); Cooper v. California, 386 U.S. 58, 59, 87 S.Ct. 788, 790, 17 L.Ed.2d 730, 732 (1967); but see State v. Cooke, 163 N.J. 657, 670-71, 751 A.2d 92 (2000) (retaining probable cause and exigent circumstances tests in assessing the reasonableness of an automobile search), "an investigative stop of a vehicle [and its occupants] becomes a de facto arrest when the officers' conduct is more intrusive than necessary" to fulfill the legitimate demands of law enforcement. State v. Dickey, 152 N.J. at 478, 706 A.2d 180 (quoting United States v. Jones, 759 F.2d 633, 636 (8th Cir.), cert. denied, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985)). Moreover, our Supreme Court has recently held that "[t]he exercise of the statutory power to make warrantless arrests for traffic offenses cannot arbitrarily and unreasonably infringe on the fundamental constitutional rights guaranteed to all citizens," and that "driving without a license, without more [does] not constitute sufficient grounds for a custodial arrest." State v. Lark, 163 N.J. 294, 296, 748 A.2d 1103 (2000).
We hasten to add that "the reasonableness of a detention is not limited to investigating the circumstances of the [initial] traffic stop." State v. Dickey, 152 N.J. at 479, 706 A.2d 180. "If, during the course of the stop or as a result of the reasonable inquiries initiated by the officer, the circumstances `give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" Id. at 479-80, 706 A.2d 180 (quoting United States v. Johnson, 58 F.3d 356, 357-58 (8th Cir.), cert. denied, 516 U.S. 936, 116 S.Ct. 348, 133 L.Ed.2d 245 (1995)). While this principle may be articulated with disarming ease, the difficulty is in its application to concrete factual settings.
The question is what inquiries may a police officer lawfully propound to an individual who has been stopped for a traffic *1185 infraction. In answering this question, we are obliged to view the officer's conduct through a filter of "common sense and ordinary human experience," United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994), and in the light of "the totality of the circumstances," United States v. Fernandez, 18 F.3d 874, 878 (10th Cir.1994). Of course, our review must be a searching and thorough one. Our role is not to rubber stamp police actions. But, it bears repeating that the police are often required to act on the spur of the moment without the benefit of quiet contemplation. Our approach is thus to "`avoid unrealistic second-guessing of police officers' decisions,' " United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir.1995), cert. denied, 517 U.S. 1143, 116 S.Ct. 1436, 134 L.Ed.2d 557 (1996) (quoting United States v. Melendez-Garcia, 28 F.3d at 1052), and to "accord appropriate deference to the ability of trained law enforcement officer[s] to distinguish between innocent and suspicious actions." Ibid. (citing United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir.1994)).
It has been said that "`[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.'" United States v. Shabazz, 993 F.2d 431, 435 (5th Cir.1993) (quoting United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir.1988)). Under ordinary circumstances, "`[w]hen the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by [the] police for additional questioning.'" Ibid. A police officer may not engage in "excessive questioning about matters wholly unrelated to the purpose of a routine traffic stop...." United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir.), cert. denied, 508 U.S. 944, 113 S.Ct. 2427, 124 L.Ed.2d 647 (1993).
We are, nevertheless, satisfied that the trooper's initial questions in this case concerning where the defendants had been and where they were going were reasonably related to the reason for the traffic stop. These inquiries had a substantial nexus to ascertaining the reasons for Chapman's erratic driving and whether he and his passengers posed a danger to others on the road. It will be recalled that Trooper Ocetnik suspected the driver's intoxication or fatigue caused the pickup truck to weave between lanes and fluctuate in speed. Upon stopping the vehicle and observing Chapman's behavior, Ocetnik immediately discounted the possibility that Chapman was drunk. He nevertheless remained concerned about the possibility of fatigue. Because Chapman did not have a valid driver's license, Ocetnik was duty-bound to inquire into whether one of the passengers could safely and lawfully drive the vehicle.
We have recognized that police officers "have a community caretaking function." State v. Washington, 296 N.J.Super. 569, 572, 687 A.2d 343 (App.Div.1997); see also Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); State v. Martinez, 260 N.J.Super. 75, 615 A.2d 279 (App.Div.1992). That function has its source in the ubiquity of the automobile "and the dynamic, differential situations police officers are confronted with to promote driver safety." State v. Washington, 296 N.J.Super. at 572, 687 A.2d 343 (citing United States v. Rodriguez-Morales, 929 F.2d 780, 784-86 (1st Cir.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992)). That duty is measured by the tumult of the streets rather than "the esoteric perspective of the courtroom." Ibid. In light of that responsibility and the circumstances confronting Trooper Ocetnik, questions pertaining to the nature and purpose of the trip, the recent whereabouts of the driver and passengers, their destination, and their relationship to each other were reasonably related to the purpose of the stop. See, e.g., United States v. Allegree, 175 F.3d 648, 650 (8th Cir.), cert. denied, ____ U.S. ____, 120 S.Ct. 388, 145 L.Ed.2d 303 (1999) ("[a] reasonable *1186 investigation following a justifiable traffic stop may include asking for the driver's license and registration, asking the driver to sit in the patrol car, and asking about the driver's destination and purpose"); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir.1998) (after stopping car for traffic violation, officer properly asked "questions relating to presence in the area, destination and purpose"); United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993) (asking driver about destination was "reasonably related to ascertaining the reasons for [the driver's] erratic driving and whether he posed a danger to others on the road").
Because Chapman, Curran and Roberto Velez gave inconsistent statements concerning their recent whereabouts, the troopers were entitled to expand the scope of the stop and ask additional, more intrusive questions. United States v. Lyton, 161 F.3d at 1170 (citing United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir.1994), cert. denied, 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995)); see also United States v. Johnson, 58 F.3d 356, 358 (8th Cir.), cert. denied, 516 U.S. 936, 116 S.Ct. 348, 133 L.Ed.2d 245 (1995). The fact that these individuals could not agree on where they had just been reasonably aroused the troopers' suspicions. Moreover, the troopers' observations of Ruben Velezspecifically the fact that he was perspiring profusely despite the frigid January weatherconstituted an additional basis for further investigation.
Beyond this, it appears that most, if not all, of the troopers' questioning occurred while Ocetnik was awaiting a computer check to verify the information Chapman and his passengers had given pertaining to the status of their California drivers' licenses. It is at least arguable that the questioning did nothing to extend the duration of the initial, valid seizure. It appears that the troopers were waiting for the results of the computer check until shortly before they received Chapman's consent to search the car. This case thus "does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers." United States v. Sharpe, 470 U.S. at 687, 105 S.Ct. at 1576, 84 L.Ed.2d at 616. The detention up to the point the troopers obtained Chapman's consent "continued to be supported by the facts that justified its initiation." United States v. Shabazz, 993 F.2d at 437; see also United States v. Walker, 933 F.2d 812, 816 n. 2 (10th Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (determination that detention was unlawful would be different "if the officer asked the same questions while awaiting the results of [a computer check]").
We thus reject defendants' contention that the detention ripened into an invalid, de facto arrest. We add that the facts of this case are a far cry from those present in State v. Dickey, 152 N.J. 468, 706 A.2d 180. There, the motorists were removed from the place of the original detention, handcuffed as they were transported in a police car, albeit voluntarily, to the police station, handcuffed at times in the station house, and told that they were not free to leave. Id. at 482, 706 A.2d 180. In these circumstances, the detention of the defendant was held to "`no longer be justified as an investigative stop.'" Ibid. (quoting United States v. Sharpe, 470 U.S. at 685, 105 S.Ct. at 1575, 84 L.Ed.2d at 615). None of these facts is present here. We conclude that defendants' detention was supported by an articulable suspicion that criminal activity might be afoot, see State v. Abreu, 257 N.J.Super. 549, 555, 608 A.2d 986 (App.Div.1992) ("on-the-spot" questioning of defendants did not violate their constitutional rights since the stop of their vehicle was valid), or at the very least, by the need to assure that allowing the defendants to proceed on their way would not pose a danger to the public.

III.
We would reach the same result even were we to find that the detention was *1187 unlawful. In that event, we would conclude that Chapman's consent to search was sufficiently an act of free will to purge the original taint emanating from the unlawful detention.
A warrantless search is per se unreasonable unless it falls within one of a few, well-defined exceptions. State v. Demeter, 124 N.J. 374, 379-80, 590 A.2d 1179 (1991). One of these exceptions is a search conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854, 858 (1973). It is, of course, fundamental that consent to search must be voluntary. Id. at 222, 93 S.Ct. at 2045, 36 L.Ed.2d at 860. Moreover, under the New Jersey Constitution, a consent to search is valid only if the person giving consent has knowledge of his or her right to refuse. State v. Johnson, 68 N.J. 349, 353-54, 346 A.2d 66 (1975).
To meet its burden, the State is required to prove voluntariness by "clear and positive testimony." State v. King, 44 N.J. 346, 352, 209 A.2d 110 (1965). "Voluntariness is a question of fact to be determined from all the circumstances...." Schneckloth v. Bustamonte, 412 U.S. at 248-49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875. Consent contemplates the exercise of choice, "and choice entails the opportunity to evaluate the available options." State v. Johnson, 68 N.J. at 355, 346 A.2d 66 (Schreiber, J., concurring). The right of self-decision is effectively safeguarded if the person giving consent knows that the search may be refused. Ibid. This knowledge may be imputed from information furnished by the police. Ibid.; see also State v. Binns, 222 N.J.Super. 583, 537 A.2d 764 (App.Div.), certif. denied, 111 N.J. 624, 546 A.2d 540 (1988).
Against this backdrop, the trial judge's finding that Chapman's consent was voluntary is supported by substantial, credible evidence present in the record.[3]State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). It is undisputed that Chapman dated and signed the consent form after Trooper Ocetnik read it aloud to him. The videotape discloses that Chapman was looking at the consent to search document while it was being read by Ocetnik, and that, at one time, he even corrected the officer regarding the year of the vehicle. There is no evidence that Chapman was coerced or threatened. While the circumstances surrounding the traffic stop and detention undoubtedly placed Chapman in a difficult situation, the record is barren of any evidence that he was too fearful to make a reasoned evaluation of his options. We perceive no sound basis to disturb the trial judge's findings and conclusions in that respect.
We reject defendant's argument that if the detention was unlawful, the consent necessarily constituted the "fruit of the poisonous tree." It is true that statements that result from an illegal detention may be inadmissible. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It is possible, however, for the causal chain between an unlawful detention and evidence discovered afterward to be broken. With respect to a statement, for example, this requirement is met if the statement is "sufficiently an act of free will to purge the primary taint." Id. at 486, 83 S.Ct. at 416-17, 9 L.Ed.2d at 454. This point was *1188 considered by the United States Supreme Court in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), where the defendant gave a statement after his illegal arrest while being unlawfully detained in police custody. The Court declined to adopt a "per se or but for rule" that would exclude all confessions made by a suspect while illegally detained. Id. at 603, 95 S.Ct. at 2261-62, 45 L.Ed.2d at 427. The Court instead reasoned:
The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda[4] warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and the flagrancy of the official misconduct are all relevant. Ibid.

In a long line of decisions, these principles have been applied with equal force to a consent to search that has been obtained by the police while the defendant was unlawfully detained. See, e.g., United States v. Kreisel, 210 F.3d 868, 869-70 (8th Cir.2000); United States v. McGill, 125 F.3d 642, 643-44 (8th Cir.1997), cert. denied, 522 U.S. 1141, 118 S.Ct. 1108, 140 L.Ed.2d 161 (1998); United States v. Thomas, 83 F.3d 259, 260 (8th Cir.1996), cert. denied, ____ U.S. ____, 120 S.Ct. 625, 145 L.Ed.2d 518 (1999); United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir.1994), cert. denied, 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995); United States v. Kelley, 981 F.2d at 1470; United States v. Walker, 933 F.2d 812, 817 (10th Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); United States v. Poulack, 82 F.Supp.2d 1024, 1031-32 (D.Neb.1999); State v. Scott, 926 S.W.2d 864, 868-69 (Mo.Ct.App.1996); State v. Avila-Avina, 99 Wash.App. 9, 991 P.2d 720, 724-25 (2000). In United States v. Ramos, 42 F.3d 1160, for example, the defendant granted the police permission to search his pickup truck, resulting in the seizure of a substantial quantity of marijuana and weapons. Id. at 1162. The Court affirmed the defendant's conviction even though the contraband was seized and confiscated while the defendant was unlawfully in police custody. Id. at 1164. In reaching this conclusion, the Court recognized that the defendant's written consent "was the result of the illegal detention in a `but for' sense." Ibid. The Court acknowledged that "[i]f the illegal detention had never taken place, if [the defendant] had been sent on his way after the document check had been properly concluded, the subsequent conversation, including the offering of the consent form, would not have occurred." Ibid. Emphasizing that the police officer told the defendant he did not have to consent to the search, the Court found this evidence "indicat[ed] rather strongly [that the officer] was not attempting to exploit an illegal situation." Ibid.
Similarly, in United States v. Thomas, 83 F.3d 259, the defendant, who had been stopped for speeding, gave his consent to search his vehicle, resulting in the seizure of cocaine. The district court suppressed the evidence, finding that the police officer lacked an articulable and reasonable suspicion to justify the defendant's detention. Id. at 260. "Because this conclusion was based solely on the fact that the consent followed an illegal detention, and because the district court did not take into account subsequent events that demonstrate[d] that the consent was freely given," the Court of Appeals "conclude[d] that the district court's finding [was] clearly erroneous." Ibid. As in Ramos, the Court stressed that the police officer told the defendant he had the right to refuse to grant permission for a search. Ibid. The *1189 Court further emphasized that "the officer... had some suspicion that criminal activity was afoot, and the violation of Terry was not flagrant." Ibid. "Based on these two factors, [the Court held] that `signing the consent form was sufficiently an act of free will ... to purge the taint of the preceding illegal detention.'" Ibid. (citation omitted).
United States v. Poulack, 82 F.Supp.2d 1024, is also illustrative of this point. There, the police confiscated marijuana after obtaining the consent of the defendant to search his vehicle following a traffic stop. Id. at 1029. The defendant contended that his consent was obtained while he was unlawfully detained. Id. at 1030. The district court assumed that the detention was unlawful, but nonetheless sustained the search and seizure on the ground that the defendant's consent was "`sufficiently an act of free will to purge the primary taint.'" Id. at 1031 (quoting Wong Sun v. United States, 371 U.S. at 486, 83 S.Ct. at 416-17, 9 L.Ed.2d at 454). In reaching this result, the district court considered "`whether [the defendant] understood his right to withhold consent, the temporal proximity of his consent and the prior Fourth Amendment violation, the presence of intervening circumstances and particularly, the purpose and flagrancy of the official misconduct.'" Ibid. (quoting United States v. McGill, 125 F.3d at 644). The district court concluded that "[e]ven if [the police officer's] conduct was technically illegal, [it] was in good faith, and the constitutional violation was not flagrant." Id. at 1032.
Applying these principles, we conclude that Chapman's consent was not the product of the allegedly unlawful detention. In reaching this conclusion, we have given special attention to the Supreme Court's admonition that in deciding whether evidence should be suppressed in circumstances like the present ones, we should consider "particularly, the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 427. We detect nothing in the record that would support a conclusion that the police purposefully engaged in misconduct. There is no evidence that Trooper Ocetnik stopped the truck as part of a preconceived plan to extract a consent to search from the driver. Even assuming that several of the questions propounded by the officers were unduly intrusive, at the very least, the circumstances were suspicious. There is no litmus test distinguishing a lawful from an unlawful detention. If the troopers improperly crossed this thin wavery line, their error was nonetheless made in good faith and was not flagrant. It must be remembered that the evil sought to be ended by the suppression rule was "insolence in office." State v. Bisaccia, 58 N.J. 586, 591, 279 A.2d 675 (1971). In light of the menace Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) was designed to stop, indiscriminate suppression of the evidence seized in this case would seem to many to constitute overkill. The police acted properly and in accordance with our cases in apprising Chapman of his rights and in obtaining his consent to search. We hold that his consent was an act of free will that validated the search[5].

IV.
The troopers clearly had the right to search the unclaimed suitcases. No one claimed ownership of the suitcases. Defendants thus "`objectively relinquish[ed] [their] expectation of privacy in the object[s] searched.'" State v. Abreu, 257 N.J.Super. at 556, 608 A.2d 986 (quoting State v. Allen, 254 N.J.Super. 62, 67, 603 A.2d 71 (App.Div.1992)); see also State v. Lee, 245 N.J.Super. 441, 449-50, 586 A.2d 256 (App.Div.1991). In any event, Troopers Ocetnik and Kratzer detected the odor *1190 of marijuana before opening and searching the suitcases. The search was thus supported by probable cause and exigent circumstances.
We affirm defendants' convictions. We note, however, that Safe Neighborhoods Service Fund assessments were imposed although the crimes were committed prior to the effective date of the governing statute. State v. Smith, 307 N.J.Super. 1, 16, 704 A.2d 73 (App.Div.1997), certif. denied, 153 N.J. 216, 708 A.2d 67 (1998); State v. Schroth, 299 N.J.Super. 242, 248, 690 A.2d 1071 (App.Div.1997). We vacate these assessments. There is no need for a remand because the assessments are not reflected in the judgment of conviction.
NOTES
[1] Roberto Velez is Ruben's brother. He is a fugitive and did not participate in the motion.
[2] Aside from the issues we discuss in this opinion, Ruben Velez claims that he is the victim of unlawful "profiling." We do not address this question. A special part of the Appellate Division has been designated to consider and resolve questions pertaining to profiling. Our disposition of the issues is without prejudice to Velez's right to argue that point before the designated part.
[3] Both defendants attack the judge's finding in the remand proceedings that Chapman was untruthful when he testified that the troopers told him they would arrest the occupants and impound or search the truck pursuant to a warrant if he did not consent. Specifically, they point to the judge's statement in his written opinion that he would have suppressed the evidence had he believed Chapman's account. Defendants assert that this statement indicates that the judge had no independent recollection of the testimony and was seeking merely to "reconstruct" the finding to suit our remand order. In our view, this is a strained interpretation of the judge's comment. The judge obviously meant that his disbelief of this portion of Chapman's testimony was implicit in his denial of the motion to suppress evidence.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] We repeat that we have not addressed or considered defendants' claim that the seizure of the contraband was the product of unlawful "profiling." See n.2, ante. As we noted earlier, that question may be addressed by the part designated to consider "profiling" questions. Defendants are not foreclosed from challenging the validity of Chapman's consent in the context of the "profiling" contention.