**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4876-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RICARDO CARRILLO,
a/k/a RICARDO CARRILLO
SANTIAGO,

     Defendant-Appellant.

_____

Argued October 20, 2022 – Decided October 27, 2022

Before Judges Haas and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 16-09-0789.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, on the brief).

William P. Cooper-Daub, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Daniel Finkelstein, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A Cumberland County grand jury charged defendant Ricardo Carrillo in a three-count indictment with two counts of first-degree murder, contrary to N.J.S.A. 2C:11-3(a)(1) and (2), and one count of second-degree disturbing, moving, or concealing human remains, contrary to N.J.S.A. 2C:22-1(a)(1). Prior to trial, defendant unsuccessfully moved to suppress evidence the police seized from his cell phone and the video-recorded confession he subsequently gave to the police.

Following a multi-day trial, the jury convicted defendant on all three counts of the indictment. The judge sentenced defendant to two consecutive life terms without parole on the murder convictions, and to a concurrent ten-year term on the remaining charge. The judge imposed customary fines and penalties, and ordered defendant to pay restitution in the amount of $10,000.

On appeal, defendant raises the following contentions:

> POINT I
>
> DEFENDANT'S MOTION TO SUPPRESS BOTH THE CONTENTS OF HIS PHONE AND HIS RESULTING CONFESSION SHOULD HAVE BEEN GRANTED; THE "CONSENT" SEARCH OF THE PHONE LACKED ANY ACTUAL, VALID CONSENT, AND THE CONFESSION WAS THE DIRECT AND IMMEDIATE "FRUIT" OF THAT UNCONSTITUTIONAL SEARCH.

2

POINT II

THE SEQUENTIAL "ACQUIT FIRST" PORTION OF THE JURY INSTRUCTION AND VERDICT SHEET TOLD THE JURY, IN DIRECT VIOLATION OF STATE V. COYLE, 119 N.J. 194 (1990), TO DELIBERATE ON PASSION/PROVOCATION MANSLAUGHTER ONLY AFTER FINDING DEFENDANT NOT GUILTY OF PURPOSELY OR KNOWINGLY KILLING THE VICTIM. (NOT RAISED BELOW).

POINT III

THE TRIAL JUDGE IMPROPERLY HELD THAT A PROFFERED DEFENSE EXPERT WITNESS COULD BE IMPEACHED WITH EVIDENCE OF PRIOR SPECIFIC ACTS NOT THE SUBJECT OF A CONVICTION, EVEN THOUGH THE APPLICABLE EVIDENCE RULES QUITE CLEARLY BAR THAT PRACTICE, AND ALSO IMPROPERLY HELD THAT THE SAME WITNESS COULD BE IMPEACHED WITH AN EXPUNGED CRIMINAL CONVICTION.

POINT IV

THE MATTER SHOULD BE REMANDED FOR A RESTITUTION HEARING REGARDING DEFENDANT'S ABILITY TO PAY. (NOT RAISED BELOW).

After reviewing the record in light of the contentions advanced on appeal, we affirm defendant's convictions and sentence.

3

I.

Neidy Ramirez and her three-month old daughter Genesis[1] went missing the day after Thanksgiving. The following Monday, Neidy's sister found Neidy's car on the side of the road on Route 55. The car doors were unlocked and Neidy's purse was still in the car. Neidy's sister called the police.

Detectives Miguel Rodriguez and Nelson Gonzalez were assigned to the investigation. They contacted defendant, who was Neidy's estranged husband,[2] and asked if they could speak to him. Defendant stated he would come to police headquarters the next afternoon. When defendant arrived, Rodriguez asked him what his preferred language was, and defendant replied that he knew how to speak and read English, but preferred Spanish.[3]

The detectives escorted defendant to an interview room for a "witness interview." Rodriguez explained that, in such an interview, a subject is "free to leave at any time. He's not under arrest. I'm basically just trying to get

---

[1] Because the victims share the same last name, we refer to them by their first names with no disrespect intended.

[2] Neidy and defendant were still married, but had been separated for two years. Genesis was not defendant's child.

[3] Rodriguez was bilingual in Spanish and English.

A-4876-18

information that could lead me to find them."  The detectives made a video-recording of the interview.

At first, defendant stated he did not know where Neidy and Genesis were. He claimed he dropped off two of their children to Neidy on Thanksgiving Day and picked them up on Friday evening.  Defendant told the police he called Neidy four or five times on Saturday, but she did not answer.  The following exchange ensued:  "[GONZALEZ]:  . . . do you have your phone with you? [DEFENDANT]:  Yes.  [GONZALEZ]:  If we ask you, um take out the numbers from there and the times you called her . . . [DEFENDANT]:  Uh-huh. [GONZALEZ]:  Would you let us do that?  [DEFENDANT]:  Yes."

Rodriguez testified they asked for defendant's phone to conduct a forensic examination to pinpoint a timeframe concerning Neidy's last contact with defendant.  Gonzalez testified forensic examinations of cell phones were conducted in a separate room for security purposes and could take between one hour to eight hours.

If a phone's GPS location services were turned on, GPS data information tracking the phone's movements would be obtained during the extraction process.  Once the GPS data information was extracted, the data would then be transferred to third-party applications such as Google Maps, Google Earth,

and/or GPS visualizer.  The GPS data that was extracted from defendant's phone was transferred to Google Maps, Google Earth, and GPS visualizer.

Rodriguez provided a consent form to defendant to conduct a forensic examination of his cell phone.  The consent form was in English, which defendant confirmed that he could read, and Rodriguez also verbally translated the form into Spanish.

After defendant signed the consent form, the detectives continued to question defendant.  Rodriguez administered Miranda[4] warnings to defendant and he waived his right to remain silent.  Defendant claimed he had a good relationship with Neidy, although he admitted they frequently argued.

Gonzalez  asked defendant whether he had a Gmail account. Defendant replied that he did, and he voluntarily gave the detective his username and password for that account.  Gonzalez testified the Gmail account information was needed to transfer the GPS data information that had been extracted from the cell phone examination into the Google Maps application to generate a map of the information.  Although the record does not indicate how much longer it would have taken to generate a map using Google Earth or GPS visualizer,

---

[4]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-4876-18

access to defendant's Gmail account information was not needed to generate a map on Google Earth or GPS visualizer.

Defendant began to tell inconsistent stories concerning his whereabouts over the holiday weekend. The detectives then confronted defendant with the fact that the GPS data from his phone did not match his account of the Friday Neidy and Genesis disappeared. Indeed, the data showed that defendant visited a wetland area known as "Back Neck" on Friday, then went to Neidy's apartment, then to his house, then back to Neidy's apartment, before returning to Back Neck.

At first, defendant claimed he took Neidy to Back Neck so they could be intimate with each other. However, he said they began to argue in the car and she hit him in the face. He told the detectives he took her keys and left her in the car on Route 55. He changed this account a few more times.

Finally, defendant confessed that he went to Neidy's home on Friday night and argued with her. He was upset she had a relationship with another man. After she taunted him, defendant grabbed Neidy's neck and strangled her until she was no longer breathing. Defendant claimed Genesis died when he and Neidy fell on top of the baby during their argument. Defendant stated the baby was twisting her body in a strange manner and he covered her mouth with his hands so she would stop. He then placed a "ribbon" around Neidy's neck.

7

Defendant stated he put Genesis in a trash bag and took the baby and Neidy to Back Neck in the back of Neidy's car. He then dumped the bodies there in different locations before leaving the car on the side of the road. Defendant agreed to help the detectives locate the bodies, and they placed him under arrest.

After the detectives recovered the bodies, they returned with defendant to headquarters and continued their interrogation. Defendant stated he decided to kill Neidy early on Friday. He also stated he wanted to seek "revenge" and "vengeance" for the way Neidy treated him.

The State's medical examiner testified that Neidy died from "[b]lunt neck trauma and that would involve manual and ligature strangulation." The expert stated defendant used his hands and a wire or phone cord to strangle Neidy. The expert testified that Genesis died as the result of "[c]hest compression asphyxia, which is squeezing of the chest, where it can no – body – the person can no longer breathe." The medical examiner ruled that both deaths were homicides.

Defendant testified on his own behalf. He admitted he strangled Neidy to death after she started hitting and pulling his hair during their argument. He claimed that Neidy grabbed him by his neck and his knee hit Genesis in the chest as he fell. Defendant stated the baby had a "dent" in her chest. Defendant stated he used his hands and a ribbon from a Christmas tree to strangle Neidy. He

stated he decided to hide the bodies because he "was desperate" and did not want to go to jail.

## II.

In Point I, defendant contends the trial court erred in denying his motion to suppress the contents of his cell phone and his confession. Specifically, he asserts the consent search of his cell phone was not valid, "and the confession was the direct 'fruit' of that unconstitutional search." We disagree.

When it denied defendant's suppression motion, the trial court found that defendant voluntarily consented to having his phone searched and his confession was the fruit of that search. Our review of a decision on a motion to suppress is deferential. State v. Hubbard, 222 N.J. 249, 269 (2015). We defer to the trial court's factual findings, because the court had the ability to observe the demeanor, tone, and physical actions of all the witnesses and defendant during the hearings and had the ability to "evaluate the credibility of [their] testimony." State v. Scriven, 226 N.J. 20, 32 (2016). To warrant reversal, the reviewing court must be convinced that the trial court's factual findings "are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Id. at 244 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). In contrast, we review the trial court's conclusions of law de novo. State v. Watts, 223 N.J. 503,

9

516 (2015).

Concerning consent searches, consent to search must be voluntary. State v. Chapman, 332 N.J. Super. 452, 466 (App. Div. 2000). "Moreover, under the New Jersey Constitution, a consent to search is valid only if the person giving consent has knowledge of his or her right to refuse." Ibid. In determining voluntariness, the court must consider the totality of the circumstances. Ibid.

As to the search of his cell phone, defendant contends his consent was not informed because the detective incorrectly translated a sentence on the consent form. The sentence at issue was: "I have the right to search the property, which is your cell phone." He argues the detective "told defendant they had the right to search the phone, as opposed to his having the right not to have his phone searched."

Concerning the consent form, which was provided in English, the trial court found the verbal Spanish translation of the consent form was "substantially summarized" and found defendant was not confused as to the way the consent form was written and explained. The first paragraph of the consent form read as follows:

> I <u>Ricardo Carrillo Santiago</u>,[5] having been informed of my constitutional rights not to have a search made of the property hereinafter mentioned without a search warrant, and of my right to refuse consent to a search, and having been advised that I can be present during the search and stop said search at any time while it's being conducted, do hereby authorize Officer/Detective(s) <u>Det. Miguel Rodriguez</u>, to execute a forensic examination of my <u>Galaxy S6 active</u> identification number(s) [defendant's phone number].

The consent form was given to defendant and, although defendant confirmed that he was able to read English, Rodriguez explained the form and provided him a word-for-word Spanish translation. Rodriguez's translation was translated back to English for the transcript as follows:

> [RODRIGUEZ]: I, Ricardo Carrillo Santiago, have been informed of my constitutional rights –
>
> . . . .
>
> [RODRIGUEZ]: That I have been informed of my constitutional rights, I have the right to search the property, which is your cell phone.
>
> [DEFENDANT]: All right.
>
> [RODRIGUEZ]: Without the, without a search warrant. And that I have the right to deny the, the, [UI][6] search. And having been advised that I can be present during the [UI] and the, where the [UI] during the search and I

---

5  Underline indicates written in.

6  UI stands for "unintelligible."

can stop it at anytime . . .

[DEFENDANT]: Uh-huh.

[RODRIGUEZ]: . . . while in progress.  I authorize the detective . . .

[DEFENDANT]: Uh-huh.

[RODRIGUEZ]: . . . which is me, to do the forensic examination of me.  In this case the phone.  What is that? An iPhone?

When asked about the sentence at issue during cross-examination, Rodriguez testified that he was "going by what the form says."  Gonzalez testified that, although the forensic examination of defendant's cell phone was done in a separate room in the police department, defendant could have stopped the search at any time, as other people in the past had done.

Under these circumstances, we are satisfied the record supports the trial court's finding that the translation was "substantially summarized" and defendant was not confused by the translation.  Additionally, the record does not reveal any language barriers, it does not reveal that defendant posed questions concerning the translation, nor was there any indication that defendant was coerced.  Further, the defendant admitted that he could read English.  Finally, Rodriguez referenced "the right to deny" the search during the same explanation.

12

Defendant next argues the consent was invalidly obtained on a "rolling basis" because defendant gave detectives the passcode to his cell phone while Rodriguez was translating the consent form from English to Spanish and before it was signed. This argument also lacks merit. The trial court fully explained the circumstances surrounding defendant's voluntary consent. The court noted the matter began as a missing persons investigation and defendant's responses, specifically him telling detectives he had contact with Neidy, prompted the detectives to conduct a forensic examination of his cell phone to narrow the timeline of Neidy's last known contacts.

As to the passcode, the consent form stated the following: "If applicable, I also consent to providing my devices' security passcode," with the words "passcode disabled" handwritten on the corresponding blank. The passcode was obtained while the consent form was being translated. The detectives asked defendant if his phone had a lock and what the lock number was, and defendant provided it to them.

In support of his argument that his consent was invalid because it was obtained on a "rolling" basis, defendant cites State v. Vincenty, 237 N.J. 122 (2019). However, that case is readily distinguishable from this matter. In Vincenty, one of the detectives conducting an interrogation read the defendant's

Miranda rights before informing him of the charges that were filed against him. Id. at 127-29. The Court held that the failure of the detectives to inform the defendant of the charges filed against him before asking him to waive his rights against self-incrimination deprived the defendant of "information indispensable to a knowing and intelligent waiver" of those rights. Id. at 135.

Defendant argues that the police in this case used "the same devious, underhanded manner" to obtain his consent to search his cell phone that the police in Vincenty used to obtain a waiver of the right to remain silent, but defendant's case reliance on Vincenty is misplaced. Unlike in Vincenty, no formal charges were filed against defendant when they asked for his consent to search the cell phone, and the police did not mislead him regarding his status at the time consent was requested. Rodriguez asked to speak with defendant concerning the missing persons investigation of Neidy and Genesis, and defendant responded he would come to the police station the next day. After learning defendant had contact with Neidy, the detectives asked in a noncoercive manner if they could search his cell phone, and defendant replied yes.

Consent for disabling the passcode was needed to conduct the forensic examination and if defendant said no, the search would not have occurred, which was why the passcode provision was included in the consent form. This supports

14

the trial court's finding that the circumstances surrounding his consent established that defendant voluntarily consented to having his phone searched. As Rodriguez testified, the purpose of conducting a forensic examination on defendant's phone was to pinpoint a timeframe. As indicated in the consent form and explained to defendant, the forensic examination included extracting not only phone calls but also GPS data. Nothing in this record suggests the police had or withheld information from defendant that was "indispensable to a knowing and intelligent waiver" of his rights, which was the concern in Vincenty.

Defendant also argues the consent form was contradictory because it stated that he had the right to be present during the search but then stated he would not have the right to be present. Additionally, the form stated he had the right to stop the search but then later stated he agreed he could not do so.

The trial court addressed the issue of whether the waiver presented to defendant informed him of whether he could waive his right to be present during the search of his cell phone. The court indicated the portion of the form where it stated defendant had the right to be present during the search and then later stated he was waiving that right did not "create confusion" and found defendant voluntarily waived his right to be present during the search of his cell phone.

A-4876-18

The court stated the waiver was "the result of the type of search being made." It noted the search

> was a computerized search, a data dump of a cellphone which is done in a lab maintained at the Vineland Police Department, which has restricted access for very good reasons. You can't have members of the public or lay persons inside an area where evidence is maybe being collected by the police department for fear of contamination of evidence or interference with that production of evidence.

Again, the court found defendant was not confused as to the way the consent form was written and explained.

As noted above, the first paragraph of the consent form stated defendant "can be present during the search and stop the search at any time while it is being conducted." The final paragraph of the form stated the following: "I, Ricardo Carrillo do not wish to be present during the search/examination of my device. I also give Law Enforcement Officers full custodial rights to the device until said examination is completed and I understand I will not be able to stop said search at any time."

The form stated that defendant could be present during the search and could stop the search, and then later that he agreed to waive those rights. See State v. Santana, 215 N.J. Super. 63, 72-73 (App. Div. 1987) (holding a suspect can waive the right to be present during a search). As noted above, the record

amply supports the finding that defendant was not confused by the translation as he admitted he could read English, the police had a valid, security-based reason to examine the cell phone in a separate room, and defendant did not ask for any clarification or express confusion at the time he consented to the search.

Finally on this point, defendant asserts that, even assuming he consented to the search of his cell phone and voluntarily provided the passcode, the detectives' request for his Gmail password constituted a separate search for which independent consent was needed, but his Gmail password was simply "demanded" from him after the consent form was signed. He argues that he was not provided an additional form for his Gmail password and was not told he had the right to refuse the request. As a result, he argues his cell phone information, and in particular the "location information" that the police used to create a map that was "the linchpin in getting defendant to 'crack'" was the fruit of an unconstitutional search. This argument also lacks merit.

The consent form stated the following:

> I am aware this examination could extract all ingoing and outgoing call events, GPS and/or location information, all account passwords, contact lists, text messages (SMS/MMS), data (Internet) sessions, calendar lists, stored media, third[-]party application content (i.e. Facebook, text applications), previously deleted content, and/or any other data stored within the devices' memory, SIM card, external memory card,

A-4876-18

and/or any other associated hardware components.

Defendant does not dispute that the Gmail account password information was not needed to extract GPS data. As discussed above, if a phone's location service were turned on, it would gather the GPS data—meaning the phone's movements were being tracked. If a phone's location services were turned on, such as in this matter, the forensic examination would be able to extract the GPS data tracking information, which would then be transferred to third-party applications such as Google Maps, Google Earth, and/or GPS visualizer to generate a map. As noted above, the GPS data that was extracted from defendant's phone was transferred to Google Maps, Google Earth, and GPS visualizer. The Gmail account information was only needed to generate a map for Google Maps. Thus, the Gmail account information was only used to generate a map of the GPS data already extracted from the phone pursuant to a valid search, and the police could have used alternate means to generate the map—means for which no passcode from defendant would have been required.

Accordingly, the record fully supports the trial court's finding that defendant's confession was not the fruit of an unconstitutional search because he voluntarily consented to a search that included the extraction of GPS data. Because the police could have generated a map from that validly extracted GPS

18

data without using defendant's Gmail account at all, and they could have used that map to question defendant as to his various movements on the night of the murders, the Gmail account search was not a vital step in obtaining defendant's confession. Thus, even assuming the police were obliged to obtain a separate consent before obtaining the Gmail password, his confession cannot be linked to the unconstitutional search sufficiently to be considered a fruit of that poisonous tree.

## III.

In Point II, defendant contends for the first time on appeal the trial court erred by indicating in "the sequential 'acquit first'" portion of the jury instruction and in the verdict sheet that jurors should only deliberate on the passion/provocation manslaughter charge if they found defendant not guilty on the murder charge. He argues the instruction and verdict sheet go against the holding in State v. Coyle, 119 N.J. 194 (1990), as well as post-Coyle model verdict sheets, thereby affecting the result. He argues that since the "acquit first" instructions "improperly precluded or inhibited proper consideration of passion/provocation manslaughter as a lesser-included offense, defendant's Fourteenth Amendment due-process and fair-trial rights and his corresponding state-constitutional rights were violated and his murder convictions should be

reversed and those counts remanded for retrial." Again, we disagree.

The court instructed the jury that, under the murder charge, the charge would be broken up into murder, passion provocation, aggravated manslaughter, and reckless manslaughter. The court instructed the jury first on the elements of murder and then on passion provocation. Under the murder count for Neidy, the court instructed the jury as follows:

> A person is guilty of Murder if he, one; caused the victim's death or serious bodily injury that then resulted in death. And two; the Defendant did so purposely or knowingly. And three; did not act in the heat of passion resulting from a reasonable provocation. If you find beyond a reasonable doubt that the Defendant purposely or knowingly caused Neidy Ramirez's death, or serious bodily injury that then resulted in death, and that he did not act in the heat of passion resulting from a reasonable provocation, the Defendant would be guilty of Murder. If, however, you find that the Defendant purposely or knowingly caused death or serious bodily injury that then resulted in death and that he did act in the heat of passion resulting from a reasonable provocation, the Defendant would be guilty of Passion Provocation Manslaughter. In order for you to find the Defendant guilty of Murder, the State is required to prove each of the following elements beyond a reasonable doubt. One; that the Defendant caused death or serious bodily injury that then resulted in Neidy Ramirez's death. And two; that the Defendant did so purposely or knowingly. And three; that the Defendant did not act in the heat of passion resulting from a reasonable provocation.
>
> [(Emphasis added).]

20

The court instructed the jury to apply the same instructions as to Genesis.  As to

Genesis, the court also instructed the jury on transferred intent.[7]

The court then read the verdict sheet to the jury.  Under the murder count,

the court instructed the jury as follows:

> So the first question that you need to answer would be
> Murder and that's as to Neidy Ramirez.  How do you
> find as to the charge that the Defendant, Ricardo
> Carrillo, on or about the 27th day or November 2015,
> in the City of Vineland, in the County of Cumberland
> aforesaid and within the jurisdiction of this Court. [sic]
> Purposely or knowingly did cause the death of Neidy
> Ramirez or purposely or knowingly did inflict serious
> bodily injury upon Neidy Ramirez, which resulted in
> the death of Neidy Ramirez?  To that question, you're
> going to check off either not guilty or guilty.  Now, if
> you find the Defendant not guilty of Murder, you [sic]
> going to go on to question number three and that deals
> with the Passion Provocation charge.

The same instructions were also given as to Genesis.

An appellate court will consider allegations of error not brought to the

trial court's attention under the plain error rule.  R. 2:10-2.  Plain error is error

that is "clearly capable of producing an unjust result."  Ibid.  In terms of its effect

in a jury trial, the error must be "sufficient to raise a reasonable doubt as to

whether the error led the jury to a result it otherwise might not have reached."

---

[7] Defendant does not dispute the court's instruction concerning transferred intent
(Db35, n.10).

State v. Macon, 57 N.J. 325, 336 (1971). An alleged error in jury instructions must be viewed in "totality of the entire charge" and if there is no prejudicial error, the verdict stands. State v. Nero, 195 N.J. 397, 407 (2008).

Certain jury instructions are so crucial to a jury's deliberations on the guilt of a criminal defendant that errors in those instructions "impacting directly upon these sensitive areas of a criminal trial are poor candidates for rehabilitation" under the plain error theory. State v. Simon, 79 N.J. 191, 206 (1979). Along with a court's instruction, verdict sheets serve as a "road map" for jury deliberations. State v. Galicia, 210 N.J. 364, 387 (2012). "When there is an error in a verdict sheet but the trial court's charge has clarified the legal standard for the jury to follow, the error may be deemed harmless." Ibid.

"[T]here is nothing inherently wrong with a sequential charge." Coyle, 119 N.J. at 223. However, in Coyle, the court rejected sequential jury charges in murder cases where there was evidence of passion/provocation. Id. at 221-22. The Court noted that "[i]n those cases a sequential charge coupled with an instruction that inadequately defines the elements of the greater offense, namely, murder, can mislead the jury." Id. at 224 (emphasis added). The Court also noted that where evidence of passion/provocation exists, the State may only obtain a murder conviction if it proves beyond a reasonable doubt that the

purposeful killing was not the product of passion/provocation. Id. at 221. The Court "suggest[ed] that trial courts instruct jurors in the initial charge on murder about the effect of passion/provocation on an otherwise-intentional killing." Id. at 224.

As noted above, defendant asserts that the instruction and verdict sheet go against the holding in Coyle, and he submits a post-Coyle sample model verdict sheet. Under question number one, the charge of murder includes the following: "1a Not Guilty of Murder [;] 1b Guilty of Passion/Provocation Manslaughter[;] 1c Guilty of Murder" (Da19). By contrast, the verdict sheet the trial court provided to the jury in this case states: "If you find defendant 'Not Guilty' of Murder, proceed to question 3" and question three concerned passion/provocation.

While the verdict sheet used in this case instructed the jury to not reach the charge of passion/provocation unless it found defendant not guilty of murder, we conclude there was no error because the court expressly incorporated the discussion of passion/provocation into the murder charge. Hence, there was no error with respect to the "sequential acquit first" order of the charge. The trial court instructed the jury on the relationship between purposeful and knowing murder and murder committed in the heat of passion and provocation. The trial

court stated that if the jury found defendant acted purposely or knowingly it was required to consider passion/provocation before it could determine whether the crime was murder or manslaughter. Only if it affirmatively found defendant "did not act in the heat of passion resulting from a reasonable provocation" could it find defendant guilty of murder. This is what is required by Coyle. Under these circumstances, we detect no error in the trial court's instruction.

IV.

In Point III, defendant asserts the trial court erred in ruling that the expert witness he proffered to testify regarding the injuries suffered by Genesis, Dr. Claus Speth, could be impeached by prior specific acts, specifically a suspended medical license and an expunged conviction for third-degree witness tampering. He argues his murder conviction as to Genesis should be reversed and the count be remanded for retrial. This argument lacks merit.

Before the State was set to rest its case, defense counsel notified the court and the State that it had retained Speth as a medical expert to rebut the State medical examiner's testimony as it was "surprised" by his opinion concerning the length of time it took for Genesis to die from chest compression asphyxiation. The defense proffered that Speth's testimony would have disputed the State expert's conclusion that Genesis died from chest compression

asphyxiation that lasted thirty to sixty seconds in support of the defense theory that Genesis died when defendant and Neidy fell on top of Genesis.

In 1997, Speth was convicted in New Jersey of third-degree witness tampering. As a result of the conviction, his medical license was suspended for over seven years, in part retroactively, by way of a consent order with the Board of Medical Examiners dated January 11, 2006. His license was reinstated on July 22, 2008, and Speth later had his conviction expunged.

Despite the defense violation of Rule 3:13-3, which requires notice of an expert within thirty days in advance of trial, the court held Speth would be allowed to testify concerning Genesis's death. As to the impeachment issue, the court held the State could cross-examine Speth as to both his expunged conviction and his suspended medical license. The court held that "the State has every right to cross-examine the doctor on the suspension of his medical license for seven and a half years."

The "problem" and "question" the court had was "what do I do with regard to the conviction[], because it has been expunged." The court noted that "we don't need to get necessarily into . . . all of the facts and circumstances surrounding" the criminal case against Speth, but it reasoned that "the fact of the matter is is [sic] that he was convicted of witness tampering and his license was

25

suspended."  The court acknowledged the conviction was expunged, but it noted that the consent order was a public record of the Board of Medical Examiners, and it further noted the Appellate Division[8] case affirming Speth's conviction was readily available to the public.

"Evidentiary rulings made by the trial court are reviewed under an abuse-of-discretion standard."  State v. Scharf, 225 N.J. 547, 572 (2016).  An evidentiary ruling will be reversed "only if it was so wide off the mark that a manifest denial of justice resulted."  Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (internal quotation marks omitted).

N.J.R.E. 607 provides that "extrinsic evidence relevant to the issue of credibility," is generally admissible "subject to Rules 405 and 608."  Here, the record supports the court's finding of admitting the suspension of Speth's medical license.  Regardless of the reason for the suspension, the State had the right to cross-examine him on his lengthy suspension because it was relevant to his credibility and basic credentials as a medical expert.

In Janus v. Hackensack Hospital, 131 N.J. Super. 535, 540-41 (App Div. 1974), the court held that it was reversible error for the trial court to preclude the defense from cross-examining a medical expert concerning the number of

---

[8]  State v. Speth, 323 N.J. Super. 67 (App. Div. 1999).

times the expert appeared in court. The court noted that where medical issues are in dispute, "[c]redibility of the competing medical witnesses [is] a paramount factor to be first determined by the jury in resolving the controversy." Id. at 541. A primary objective of cross-examination is "to shed light on the credibility of the direct testimony." Ibid. Experts generally are subject to a "searching cross-examination." Casino Reinvestment Dev. Auth. v. Lustgarten, 332 N.J. Super. 472, 492 (App. Div. 2000) (quoting DaGraca v. Laing, 288 N.J. Super. 292, 302 (App. Div. 1996)). Medical experts may also be questioned as to their "testimonial and experiential weakness[es]" through "the usual methods of cross-examination." Ibid. (quoting Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 86 (App. Div. 1961)).

Although defendant argues N.J.R.E. 405 and 608 bar the admission of the suspension and expungement, the rules are inapplicable here because they deal with methods of proving general character, a character trait, or reputation for truthfulness or untruthfulness. Here, the State was not attempting to show that Speth was a liar, but rather to show the underlying factual reason for the relevant fact that he had been suspended from the practice of medicine for seven and a half years.

Because the trial court correctly held that the fact of Speth's license

suspension could be used to impeach him, we need not reach the thornier issue of whether and to what extent the State could have delved into the conviction, later expunged, that gave rise to the suspension. Defense counsel represented that Speth would not testify "if his prior record which has been expunged comes in . . ., or any reference to his suspended license which was made retroactive." This defeats defendant's argument on this issue because he would have suffered the exact same "harm" even if the trial court had excluded all references to the expunged conviction, namely the loss of Speth's testimony. Therefore, we reject defendant's contention on this point.

V.

Finally, defendant argues for the first time on appeal in Point IV that the trial court should have conducted a hearing before ordering him to pay restitution. Again, we disagree.

N.J.S.A. 2C:44-2(b)(2) provides that "[t]he court shall sentence a defendant to pay restitution in addition to a sentence of imprisonment or probation that may be imposed if: [t]he defendant is able to pay or, given a fair opportunity, will be able to pay restitution." Before ordering restitution, the sentencing court must first determine that the defendant has a present or future ability to pay restitution. State v. Newman, 132 N.J. 159, 169 (1993); State in

28

Interest of R.V., 280 N.J. Super. 118, 121-22 (App. Div. 1995).

No restitution hearing is required where there is no dispute as to the amount and defendant's ability to pay. State v. Orji, 277 N.J. Super. 582, 589-90 (App. Div. 1994). If there is a dispute, the sentencing court is required to conduct a restitution hearing. N.J.S.A. 2C:44-2(c); State v. Jamiolkoski, 272 N.J. Super. 326, 329 (App. Div. 1994). The sentencing court must explain its reason in "order[ing] restitution, the amount of the restitution, and its payment terms." State v. Scribner, 298 N.J. Super. 366, 371 (App. Div. 1997).

Here, the record supports the trial court's decision to require defendant to pay restitution. Defendant does not dispute the applicability of the restitution statute or that the appropriate amount was $10,000 based upon the request filed by the Victims of Crimes Compensation Office. Moreover, defendant does not dispute the court's findings that he (1) would have some earning capacity for work he performed while in prison, and (2) might receive additional funds in the future in the form of an inheritance that would enable him to make payments on his obligation. Under these circumstances, we are satisfied the trial court did not abuse its discretion by ordering restitution.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4876-18